UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| FRANK V. ZAMORA, | No. ED CV 11-2018-PLA |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on January 4, 2012, seeking review of the Commissioner's denial of his application for Supplemental Security Income payments.  The parties filed Consents to proceed before the undersigned Magistrate Judge on January 18, 2012, and January 19, 2012. Pursuant to the Court's Order, the parties filed a Joint Stipulation on August 13, 2012, that addresses their positions concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## **BACKGROUND**

Plaintiff was born on July 11, 1961. [Administrative Record ("AR") at 35-36.] He has an eleventh grade education [AR at 85], and past work experience as a construction worker. [AR at 79.]

On March 24, 2009, plaintiff protectively filed his application for Supplemental Security Income ("SSI") payments, alleging that he was unable to work since 2005 due to mental health issues, including suicidal tendencies, hearing voices, paranoia, schizophrenia, and depression. [AR at 35-36, 64-72, 77-87, 108-15.] After his application was denied initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). [AR at 37-41, 43-49.] A hearing was held on May 27, 2010, at which plaintiff appeared without counsel and testified on his own behalf. Two third party witnesses also testified. [AR at 215-44.] On July 22, 2010, the ALJ determined that plaintiff was not disabled. [AR at 17-23.] On November 7, 2011, the Appeals Council denied plaintiff's request for review. [AR at 3-5, 11.] This action followed.[1]

## III.

## **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at

---

[1] Under a prior application for SSI payments, plaintiff was found disabled on May 15, 2003, but his benefits were terminated when he was incarcerated in May 2007. [See AR at 96b; JS at 1-2.] The ALJ did not mention that application in his decision. [See AR at 17-23.]

2

1257. When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner. Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

**A.  THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Id. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment

in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. The Commissioner then bears the burden of establishing that the claimant is not disabled, because he can perform other substantial gainful work available in the national economy. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.   THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

In this case, at step one, the ALJ found that plaintiff had not engaged in any substantial gainful activity since March 24, 2009, his application date. [AR at 19.] At step two, the ALJ concluded that plaintiff has the following severe impairments: substance-induced mood and psychotic disorder, and polysubstance abuse. [Id.] At step three, the ALJ determined that plaintiff does not have an impairment or combination of impairments that meets or equals any of the impairments in the Listing. [Id.] The ALJ further found that plaintiff retains the residual functional capacity ("RFC")[2] to perform a full range of work at all exertional levels but with the following nonexertional limitations: "unskilled, entry-level, object-oriented work." [AR at 20.] At step four, the ALJ concluded that plaintiff has no past relevant work. [AR at 22.] At step five, the ALJ found, based on the application of the Medical-Vocational Guidelines, that "there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform." [Id.] Accordingly, the ALJ determined that plaintiff has not been under a disability since March 24, 2009, the date he filed his application. [Id.]

/

---

[2]   RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

# V.

# **THE ALJ'S DECISION**

Plaintiff contends that: (1) the ALJ's residual functional capacity assessment for plaintiff is not supported by substantial evidence; (2) the ALJ improperly discounted plaintiff's credibility; and (3) the ALJ improperly discounted the credibility of two third party witnesses.[3]  [Joint Stipulation ("JS") at 3.]  As set forth below, the Court agrees with plaintiff, in part, and remands the matter for further proceedings.

**LAY WITNESS TESTIMONY**

Plaintiff contends that the ALJ improperly discounted lay evidence from plaintiff's sister and brother-in-law.  [JS at 12-17.]

An ALJ may consider lay witness testimony to determine the severity of a claimant's impairments and how the impairments affect his ability to work.  Stout v. Comm'r of Social Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006); Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996); 20 C.F.R. §§ 404.1513(d)(4), (e), 416.913(d)(4), (e).  Lay witnesses include spouses, parents and other care givers, siblings, other relatives, friends, neighbors, and clergy.  20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4).  Lay witness testimony by friends and family members who have the opportunity to observe a claimant on a daily basis "constitutes qualified evidence" that the ALJ must consider.  See Sprague v. Bowen, 812 F.2d 1226, 1231-32 (9th Cir. 1987).  Such testimony "is of particular value" because those who see a claimant every day can often tell whether he is suffering or merely malingering.  See Smolen, 80 F.3d at 1289 (citing Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993)).  While an ALJ is not required "to discuss every witness's testimony on an individualized, witness-by-witness basis" (Molina v. Astrue, 674 F.3d 1104, 1114 (9th Cir. 2012)), he may discount the testimony of lay witnesses only for "reasons that are germane to each witness."  Dodrill, 12 F.3d at 919; Regennitter v. Comm'r of Social Sec. Admin., 166 F.3d 1294, 1298 (9th Cir. 1999).

---

[3] Plaintiff raises the ALJ's discrediting of both his credibility and the lay witnesses' credibility in his Issue No. 2 in the Joint Stipulation.  [See JS at 12-17.]

At the hearing before the ALJ, plaintiff's sister, Carmen Coady, whom plaintiff was living with at the time [see AR at 230], testified that plaintiff "[has] never worked a day in his life." [AR at 233.] Carmen[4] testified that "when [plaintiff] says he helps out at home ... pretty much ... I ask him to take the trash out [and] [h]e'll take the trash out." [AR at 234.] She further testified that her husband once gave plaintiff a broom with which to sweep the floor, and when "[her] husband went back [plaintiff] was still just standing there with the broom ... ." [Id.] Carmen stated that "[s]ometimes [plaintiff] seems perfectly normal," but most of the time, he sits in a rocking chair at home and "listens to his Walkman." [AR at 235.] She also stated that "[h]e just can't comprehend," and that "sometimes he understands and then sometimes he doesn't." [Id.] She testified that talking to plaintiff is "almost like talking to a five[-]year[-]old," explaining that "I have to tell h[im] like a hundred times the same thing over and over and over and he just doesn't get it." [Id.] When the ALJ asked Carmen if it was true that plaintiff was not then looking for work, Carmen testified that "[plaintiff] don't [sic] even know how to fill out an application." [Id.] She stated that "[h]e's been like this practically all his life," and that "he's gotten by" because she, her mother, and her brothers have taken care of him. [AR at 236.]

Plaintiff's brother-in-law and Carmen's husband, Melvin Coady, testified at the hearing that plaintiff had then been living with them for 9 or 10 months (with the exception of an approximately 2-month period), and that plaintiff had lived with them on and off for a long time. [AR at 239-40.] Melvin testified that when it comes to working, plaintiff "cannot stay focused." [AR at 238.] Melvin stated that plaintiff can perform tasks such as sweeping, but he has "a high level of distraction." [Id.] He further stated, "[plaintiff's] mind just wanders off so I mean, yes he can do things, but ... you'll spend more time telling him to do it or stay focused ... than actually getting anything done." [AR at 238-39.] Melvin testified that one example of plaintiff's "lack of comprehensiveness" and inability to remain focused is that plaintiff has to be reminded to flush the toilet. [AR at 240.] Melvin further testified that he and Carmen "have to prepare [plaintiff's] ... meals" and that they "can't trust him around the stove." [Id.] Following the hearing, but on the same day, Melvin

---

[4] The Court refers herein to plaintiff's sister and brother-in-law by their first names for ease of identification.

6

composed a letter to the ALJ elaborating on his testimony. [AR at 116-17.] In the letter, Melvin stated that plaintiff is "not ... able to remain focus[ed] on simple task[s]," citing as an example that "[plaintiff] could take a box to point 'B' but would wander off, or just stand there, not knowing to retrieve other boxes from point 'A.'" [AR at 117.] Melvin stated that "[plaintiff's] retention level is 'shot,'" which Melvin stated he knew "because constant supervision is needed in every aspect of [plaintiff's] life." [Id.]

The ALJ discredited the statements of plaintiff's sister and brother-in-law as "not fully credible" because: (1) the ALJ found that they "have strong financial motivation to get [plaintiff] on public assistance given their meager circumstances,"[5] and (2) "[t]reatment records establish [plaintiff] is stable on medications with unremarkable mental status examinations." [AR at 21-22.]

The ALJ's first reason for discounting Melvin's and Carmen's credibility was improper. First, an ALJ may not presume bias on the part of a claimant's family members simply because they are related to the claimant. See Smolen, 80 F.3d at 1289 ("[t]he fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony"); see also Regennitter, 166 F.3d at 1298 (ALJ improperly rejected lay witness testimony of the plaintiff's mother on the basis of presumed bias). Similarly, the rejection of lay witness testimony on the ground that the testifying witness lives with or supports the claimant, and therefore must be biased, is not a reason germane to that witness. See Johnson v. Astrue, 2008 WL 4553141, at *6 (C.D. Cal. Oct. 9, 2008) ("The ALJ's reasoning that witnesses who live with or support a plaintiff are not credible for reasons of bias cannot be considered legally proper, since the same rationale could be used to reject lay witness testimony in almost every case."); see also Smolen, 80 F.3d at 1289 (ALJ's rejection of plaintiff's family members' testimony on the grounds that they were "'understandably advocates, and biased' ... amounted to a wholesale dismissal of the testimony of all the witnesses as a group and therefore does not qualify as a reason germane to each individual who testified"). Finally, substantial evidence does not support the ALJ's presumption of bias on the part of Melvin and

---

[5] Melvin testified that he and Carmen were unemployed at the time of the hearing, and that the majority of their income at that time consisted of rent from two boarders living in their house. [AR at 241-42.]

7

Carmen simply because they were unemployed at the time that they were also supporting plaintiff. While it may be true that an award of benefits to plaintiff could relieve some of the Coadys' financial strain, there is no evidence that they expect to be reimbursed for their support of plaintiff if plaintiff does receive benefits. Compare Howard v. Astrue, 2009 WL 385441, at *4 (C.D. Cal. Feb. 17, 2009) ("that plaintiff's family may have a financial interest in the outcome of the case is ... not a sufficient reason to reject the statements of plaintiff's grandmother"), with Meyer v. Astrue, 2010 WL 3211938, at **3-4 (W.D. Wash. Aug. 12, 2010) (distinguishing Howard and finding that ALJ's rejection of lay testimony from the plaintiff's mother and partner was supported by substantial evidence where the plaintiff owed them both a significant sum of money and had promised to pay them both up to $5,000 in exchange for their testimony upon approval of his disability claim). Indeed, Melvin testified that "[w]hether ... [plaintiff] receives any type of support from Social Security, [he and Carmen are] still there for him" [AR at 243], and there is no evidence in the record that Melvin or Carmen were exaggerating their statements based on a financial motive. See Howard, 2009 WL 385441, at *4 (finding no evidence that the plaintiff's grandmother was exaggerating her statements on the basis of financial motive).

Second, the ALJ discredited the Coadys' credibility because he found that "[t]reatment records establish [plaintiff] is stable on medications with unremarkable mental status examinations." [AR at 21-22.] Citing plaintiff's medical records from the Mule Creek State Prison and the California Department of Corrections and Rehabilitation ("CDCR"), dating between July 22, 2008, and October 16, 2009, the ALJ stated that "[c]urrent parole outpatient records indicate [plaintiff] is stable on medication, doing fairly well, and is allegedly abstaining from use of street drugs." [AR at 21 (citing AR at 132-214).] The ALJ also cited a June 3, 2009, progress note, stating that plaintiff had an "unremarkable mental status examination" on that date and "reported good sleep, appetite, and energy level, and was medication complaint." [AR at 21, 132.] Finally, the ALJ noted that a progress note dated October 8, 2009, indicated that plaintiff "was tolerating medications well with no report of side-effects; mental status examination was unremarkable." [AR at 21, 159-60.]

/

The ALJ erred in concluding that this evidence constituted a legitimate reason to discount the Coadys' lay witness testimony. While inconsistency with the medical evidence is a germane reason to discredit the testimony of a lay witness (Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005)), the ALJ here ignored evidence that is *consistent* with the Coadys' testimony concerning plaintiff's limitations. In the June 3, 2009, progress note, for example, the treating psychologist, after performing the mental status examination the ALJ characterized as "unremarkable," assigned plaintiff a Global Assessment of Functioning[6] score of 49.[7] [AR at 132.] The ALJ did not mention this GAF score in his decision, or any of the record's many other GAF scores assigned to plaintiff by his treating physicians. Plaintiff's treatment records from the Mule Creek State Prison and the CDCR reflect that he was consistently assigned GAF scores of between 45 and 50 [see AR at 135, 137, 139-40, 144, 148-49, 153-54, 171, 198-99], and on two occasions was assigned a GAF score of 55.[8] [See AR at 154, 167.] While these GAF scores -- without more -- may not be determinative of disability, the Court is aware of no authority asserting that GAF scores and their implications -- especially scores from treating sources -- may be ignored, as was done here. Plaintiff's scores indicate at least a moderate impairment, and possibly a major impairment, in social and occupational functioning. Even if not directly translatable into Social Security terminology, the scores may be probative of plaintiff's condition and support the lay testimony offered by the Coadys. See Olds v. Astrue, 2008 WL 339757, at *4 (D. Kan. Feb. 5, 2008) (a low GAF score does not alone determine disability, but it is a piece of evidence to be considered with the rest of the record) (citation omitted); see also Escardille v.

---

[6] A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 32 (4th ed. 2000).

[7] A GAF score in the range of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning (e.g., unable to keep a job). DSM-IV, at 32.

[8] A GAF score in the range of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). DSM-IV, at 34.

Barnhart, 2003 WL 21499999, at **5-6 (E.D. Pa. June 24, 2003) (remanding based in part on an ALJ's failure to address a GAF score of 50 "or its meaning regarding plaintiff's ability to maintain employment."); Wickramasekera v. Astrue, 2010 WL 3883241, at *26 (D. Ariz. Sept. 29, 2010) (remanding for proper consideration of treating sources' GAF assessments, even though "a GAF score in the 45-50 range [does not] automatically result[] in a disability determination"). In addition, contrary to the ALJ's characterization of plaintiff's mental status examinations as overall "unremarkable," plaintiff's treatment notes also reflect that he consistently reported auditory hallucinations [see AR at 135-38, 140-41, 153, 165-66, 168], and also reported mood swings on March 4, 2009, and July 7, 2009, dates close in time to the dates of the specific progress notes the ALJ cited. [See AR at 138, 166.] Finally, in finding that plaintiff's treatment records do not support the lay testimony given by Melvin and Carmen Coady, the ALJ also failed to discuss two "Clark Adaptive Support Evaluation" forms completed concerning plaintiff, one of which is dated October 1, 2007, and one of which is undated.[9] In the undated form, the staff member indicated that plaintiff has "[d]ifficulty learning [and] performing job tasks," has a "[d]ifficult time [with] problem solving," and "[t]ends to be passive." [AR at 205-06.] That staff member also stated that plaintiff has a "[l]imited ability to appreciate that coughing or sneezing spreads germs," and opined that plaintiff "[a]ppears willing to work but [is] unable." [Id.] The October 1, 2007, evaluation form, completed by clinical psychologist Dr. E. Force, reports that plaintiff "require[s] assistance to complete written tasks" and "ha[s] difficulty understanding complex instructions." [AR at 208-09.] Dr. Force also stated, based on plaintiff's reporting, that plaintiff is a "[r]eady [and] willing worker," but "lost jobs because 'they were too hard' -- [he] failed to understand directions." [AR at 209.] Plaintiff represented to Dr. Force that the longest job he has held was for one week. [Id.] An ALJ may not point to and discuss only those portions of the treatment record that favor his ultimate conclusion. See Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (error for an ALJ to

---

[9] The record does not contain the first page of one of the evaluation forms (and thus also does not reflect the date of completion), but the remaining pages of that form are identical to the second through fourth pages of the evaluation form that is complete and includes the heading "Clark Adaptive Support Evaluation" on the first page; the corresponding pages of the two forms differ only in content. [Compare AR at 205-07 with AR at 208-11.]

1  ignore or misstate the competent evidence in the record in order to justify his conclusion); see also
2  Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983) (while the ALJ is not obligated to "reconcile
3  explicitly every conflicting shred of medical testimony," he cannot simply selectively choose
4  evidence in the record that supports his conclusions); Whitney v. Schweiker, 695 F.2d 784, 788
5  (7th Cir. 1982) ("an ALJ must weigh all the evidence and may not ignore evidence that suggests
6  an opposite conclusion") (citation omitted); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir.
7  1975) (an ALJ is not permitted to reach a conclusion "simply by isolating a specific quantum of
8  supporting evidence").  The ALJ gave no legitimate reason germane to Melvin and Carmen Coady
9  to discount their lay witness testimony.  Remand is warranted.[10]

10  /
11  /
12  /
13  /
14  /

---

[10] The Court exercises its discretion not to address herein plaintiff's contention that the ALJ improperly discounted his credibility.  The Court also notes that while plaintiff's first contention of error in the Joint Stipulation raises multiple alleged errors made by the ALJ (e.g., that the ALJ failed to order a consultative examination of plaintiff, failed to properly evaluate whether plaintiff meets a Listing, and failed to include all of plaintiff's impairments in his RFC determination), it appears that plaintiff correctly asserts that the ALJ also erred by failing to obtain his claim file related to his prior application for SSI payments, under which he was found disabled on May 15, 2003. [AR at 96b; JS at 4-10.]  See Tominus v. Astrue, 2009 WL 35164, at **2-3 (M.D. Fla. Jan. 6, 2009) (ALJ failed to discharge duty to develop the record where the plaintiff, who applied for SSI payments alleging a mental disorder, among other things, (1) had previously been awarded SSI payments that were later terminated because he was incarcerated, and (2) alleged that he had suffered from mental illness most of his life, but ALJ failed to obtain the plaintiff's prior claim file before concluding that plaintiff was not disabled); Watson v. Astrue, 2008 WL 4072831, at **1, 5-6 (W.D. La. July 1, 2008) (ALJ failed to properly develop the evidence where there was some evidence before him that the plaintiff had mental impairments -- including evidence that the plaintiff had previously been found disabled under the Social Security Act due to anxiety disorders -- but the ALJ failed to obtain plaintiff's prior claim file, among other things, to consider the mental health records in that file).  At least some of plaintiff's mental problems appear to be longstanding [see AR at 169 ("[plaintiff] has a significant history of psychiatric disorder... [t]he onset of treatment was 1989")], and an ALJ's duty to fully and fairly develop the record is "heightened where the claimant may be mentally ill and thus unable to protect [his] own interests." Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  On remand, the ALJ should discharge his duty to fully develop the record in this case by obtaining the claim file from plaintiff's prior application for SSI payments.

## VI.

## **REMAND FOR FURTHER PROCEEDINGS**

As a general rule, remand is warranted where additional administrative proceedings could remedy defects in the Commissioner's decision. See Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000), cert. denied, 531 U.S. 1038 (2000); Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984). In this case, remand is appropriate for the ALJ to reconsider the lay witness testimony of Melvin Coady and Carmen Coady. The ALJ is instructed to take whatever further action is deemed appropriate and consistent with this decision.

Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: October 12, 2012

*/s/ Paul L. Abrams*
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE